Management. Good morning. Good morning. This is Deborah Deitch-Perez from Stinson. I'm here representing the appellants. This is an important case because it tests the boundaries of summary judgment in the context that it's at its most vulnerable. In most district court cases, the judge deciding summary judgment has only a modest amount of exposure to the lawyers and virtually no exposure to the parties. Thus, the rule that credibility isn't to be measured and the evidence is not to be weighed, not really a hard rule to follow. But when summary judgment is being decided in adversary cases, in large bankruptcies, there's often a deep relationship between the court and the lawyers and the court and the parties, particularly when summary judgment is being decided after plan confirmation, when key players have all likely appeared and testified in front of the court, making it inevitable that the bankruptcy court has some preconceived ideas about witness credibility and rendering its summary judgment decision. And the problem is compounded when the matter being adjudicated is one in which the reference is required to be withdrawn for trial. In this case, the reference was withdrawn, so if facts were to be found, they needed to be found by a jury in front of the district court. And so we know the problem here is not academic or abstract. In this court's decision, mostly affirming the confirmation of the Highland Plan, the court noted the bankruptcy court's strong views about Mr. Dondero and the companies said to be associated with him, and the court also recognized that the bankruptcy court attributed what it called Dondero's bad faith to all related parties making objections. May I ask about the reference? It's my understanding that the reference was withdrawn upon, if after the summary judgment determination would be made, if there was a need for a jury trial, then the district court was going to try it. Is that correct? The reference was withdrawn early in the adversary proceeding, and the court held the case for all matters leading up to trial. But it seems odd that you would then bifurcate back. I've never seen one where you'd send back for summary judgment determination to the bankruptcy. I've never seen that before. Is this unusual in your experience? I don't think it's that unusual. I think the court will sometimes keep the case. We argued that it would be much more efficient to have the district court hear any summary judgments because then if they granted it, it would be one thing. If they denied it, they would be better prepared for trial. So we did argue that it should be, the reference should be withdrawn for all purposes right away, but the bankruptcy court and the district court instead left it with the bankruptcy court for pretrial matters. Assuming, arguendo, that you presented enough evidence to create a fact issue as to whether the oral agreements existed, would summary judgments still be appropriate because the oral contracts would fail for lack of consideration? Not at all, Your Honor. Can you explain that, please? Yes. As everybody knows, even a peppercorn can be consideration. What is the consideration in this record? Here the consideration is Mr. Dondero had the power under the LPA to give himself more actual cash compensation each year, and he forewent doing that in order to instead have more contingent compensation, and so that was a benefit. This whole note structure was a benefit to Highland because while there would be these loans made that in the eight to ten months later during the decision-making process, they would decide whether or not they would be subject to the subsequent oral agreement and the conditions subsequent, the record shows if in fact Highland needed money, the notes were paid down during the course of the year because the primary concern was to make sure that Highland could operate. So this was a beneficial program. Could Mr. Dondero instead have sucked all the money out of Highland every year, as many private equity firms do? They start each year fresh. They pay themselves everything. Sure, but he didn't do that, and that and his incentive to work harder to get this, to achieve these goals were more than enough consideration. So he could have taken money out. He could have taken money out. That's the easy consideration. And so if you look at these reports and recommendations, the first one, which covers 16 of the 18 notes at issue here, the first one disregards all of Mr. Dondero's evidence saying that the declarations are self-serving and conclusory. Self-serving, we know, is not an adequate justification. That's Your Honor's Guzman case. I think Judge Wiener in the last couple weeks decided another, let us entertain you, where a court had weighed a lot of competing factors, and even if one's gut reaction to the factors was, ooh, this doesn't seem good, the court's not allowed to do that. If there are issues of fact, it has to go to a jury and to the fact finder. Is it conclusory? Conclusory. Can you deal with conclusory? Yes, and conclusory, all you have to do is read the declarations. They're in the—I provided a notebook because our record is, shall we say, difficult to deal with. If you look at Mr. Dondero's declarations on the oral agreement, they have the who, what, when, where. They say when they were made, how much they were, what the terms for forgiveness were. There's a lot of detail. There's a lot of detail, but, I mean, a lot of the detail is preposterous. The oral agreement was with himself, between himself, and for himself, and they weren't documented anywhere. And then they were sort of evolving over time. There was this subsequent condition that only came later because of tax consequences, when it was apparent that those would be loan forgiveness, I guess, assets that he would have to pay taxes on, right? And then the subsequent conditions were met, but everybody kept acting the same, as in the loans needed to be paid back. I mean, aren't these classic sham affidavits? No, Your Honor. How not? They're not because they give these details. Oh, and I forgot, when he was testifying, I guess, in deposition, if I've got it right, it's a big record, he couldn't recall any of these terms of the oral agreement, or various things. It had to be done later by declaration. No, Your Honor. He did recall many of the terms. He needed a list, if somebody were going to ask him, what are all the notes? I have a list. If you were to ask me what are all the notes, and how much is each one, and what date were they made, I'd need to look at that list. The fact that someone needs a list years after the event's in question doesn't, maybe it's a ping on their credibility, but it's... Particularly if they're not documented anywhere contemporaneously. They don't need, these are subsequent agreements, they don't need to be documented. Is it a list or a cheat sheet? There's a difference, right? It's an aid memoir. And the reason he didn't need to document them is because we're looking at this after the fact, and looking at this large group of materials. But this was done each year, in the comp period, December to February, so it was pretty easy to know what loans had been made in that year, and hadn't yet been paid back. Because sometimes there were loans that were paid back because Hyland needed money. And so they weren't subject to the conditions subsequent. So it wasn't something that by its nature you would think, you would need to write this down to be able to know what you were doing. And the idea, you're right, that the bankruptcy court says, one of the things the bankruptcy court says is ridiculous, is the notion that Mr. Dondera wearing his Hyland hat had a communication with Mr. Dondera wearing his Duggar boy hat. But anyone who has looked at private equity and real estate companies, where there are tens or hundreds of companies that all have the same slate of executives, there are frequently agreements made between Mr. Smith as president of company A and Mr. Smith as— Orally? Orally with no documentation? Sure. Sure. That may lead to questions about, you know, fights about what the precise terms are. But here, both Mr. Dondera and Nancy Dondera, who were on the other side, testified as to what the precise terms were. And we should not forget that, in fact, these came to pass. Your Honor mentioned that they acted as though, even after things happened, they acted as though the loans were still extant. That's not true. The one thing that the debtor and the court relied on was there was a sale of a small amount of MGM. But that didn't move the needle. The whole purpose of this plan was to have a big success so that it would be of no moment that the loans were forgiven. And, in fact, that's what happened. MGM, Cornerstone, Trustway, they all eventually sold for big amounts of money, such that, if you're following the financial disclosures, quarterly financial disclosures in the case, this is going to be a hundred-cent-plus case. So, in fact, the plan worked. It was appropriate. And the oral agreement is not the only defense there. There are also three-term loans. And the three-term loans had specific defenses. One, that Highland was supposed to pay and didn't. And, two, that they were prepayments. And there's record evidence of the prepayments, not just from Mr. Dondero. There's a schedule. There's also testimony from Mr. Waterhouse. And there's also, there's the fact that these loans were paid on various dates in the years 2017, 2018, 2019, not on that special due date at the end that the debtor says, oh, they didn't pay on that date, they're in default. But that's what happened in prior years, and there was no default called. So, that's plenty of record evidence. And, oh, one more thing. There's no evidence opposing the prepayment defense on the HCMS loan. It appears Mr. Kloss forgot to address it in his declaration. Unless it's a moon is made of green cheese kind of case, literally, can the district court or this court just say that's preposterous and I don't believe it? No. I mean, the only time you have a case, you're exactly right. The only time you have a case where you can say no reasonable juror could, like someone we're trying to prove the sun rises in the west, that's the level we have to be at here. Or, there has to be a clear admission. There needs to be something where it couldn't possibly be the case because somebody has admitted away something that's a critical element. But there isn't one. But if you look, they're not admissions. What they are are inferences that are being drawn. For example . . . If we exclude the affidavits, is there enough evidence to survive summary judgment? On the term loan, on the term loans defenses, yes. On the mistake, yes. You know, there were two loans that were supposed to be just transfers to cover the losses caused by a mistake by Highland. And there's ample evidence in the record that that's what they were. There's actually no evidence contradicting the declaration. But there's some evidence from others as well. And the note, there's evidence in the record that the note actually wasn't signed. Some low level accountant stamped Mr. Waterhouse's signature on it. How could there be summary judgment on those notes? So in the sham affidavit doctrine under Texas law, do we actually exclude entire affidavits or do we parse them and leave out certain things? I think you would parse them. But I think they can't be excluded here because they're being excluded for a reason that's impermissible. They're being excluded because, in the words of the district court, well, how could that, like, for example, with the talk of Mr. Dondero making the agreement with himself, how could that be? Let's imagine how that conversation went. That's not a basis to exclude an affidavit. These are all matters relating to credibility. They could argue to the jury that, let's imagine the conversation, right? They could do that to the jury. Exactly right, Your Honor. I see I'm almost out of time. Is there something else you want to address? Other things, going back to the subsequent agreement, there was expert testimony that Mr. Dondero was paid less than similarly situated executives and that there was a practice, albeit, you know, scant and a while ago, of other executives being given forgivable loans as part of their compensation. So going back to the question of are the declarations the only evidence? No, the declarations are not the only evidence. And I've provided a notebook full of some record excerpts that'll be easier to pull than looking at the whole electronic record. Thank you. We have your argument and you've saved time for rebuttal. Can I ask, though, is how many of these cases do we have right now? Is this a third pending appeal on this big matter that's pending right now? Do you know? I can't hear, Your Honor. There's this one. There's the appeal of the denial of the petition for a written amendment in this district court. There's another appeal that's pending right now, which is an announcement of the appeal of the judgment that was entered on which contract. So those three, I believe. But there's also the other one. Yeah. So four pending appeals right now in these Highland Capital matters, for lack of a different way to describe them. Okay. Right. Okay. Thank you. Good morning. May it please the Court. John Morris, Pachulski, Stang, Zeeland, Jones for the Eppley Highland Capital Management. Before Mr. D'Andaro caused Highland to file for bankruptcy, he and his affiliates borrowed tens of millions of dollars from Highland. Those loans were evidenced by very simple promissory notes, two pages that were created under his direction. We're here because he doesn't want to pay them back. There's no dispute that Highland has established its prima facie case. There's also no dispute that when Mr. D'Andaro controlled Highland, the notes were listed. They were given to Highland's outside auditors. They were listed as assets on Highland's internal records in their bankruptcy filings while he controlled Highland. Collections on the notes were a substantial portion of Highland's plan of reorganization. Was anything ever given to the auditors caveating that these loans were to be forgiven or there were provisions to forgive the loans? It's a great question, Your Honor. The short answer is no. And not only is the answer no, Mr. D'Andaro had an affirmative obligation to disclose them because they were related party transactions. When were the oral agreements to forgive these loans first disclosed to anybody besides Mr. D'Andaro? Six months after we commenced this action. Six months after we commenced the action. And it was only after his first answer to the complaint, he said the notes were forgiven. So we served a request for admission. Admit you didn't pay taxes on it. He had to admit it. So we amended his answer to add the concept of conditions subsequent. We said, Mr. D'Andaro, please tell us who entered the agreements on behalf of Highland. And he raised his hand. And he said, I did. He made Rule 26 disclosures that required him to disclose every single person who likely had actual knowledge of the case. He didn't name Nancy or Duggeboy. We served an interrogatory. Please tell us every person who has actual knowledge of the alleged oral agreements. He didn't name Nancy or Duggeboy. It was only after all of that happened that it became so ridiculous that he moved to amend his pleading to assert for the first time, six months while we're in the midst of discovery, that this whole agreement came into existence. To her credit, Judge Jernigan granted the motion. And here we are. Even if all that's true, and I'm not at all suggesting that that's not all true, and that they should have, the forgiveness thing should have come out earlier, the fact that Nancy was part of it should have come out earlier, that there was some effort to hide that, or that this is an evolving thing, that whatever works for the moment works. Why isn't that still appropriate for factual determinations by the jury, who might very well, if what you say is true, pour him out very quickly? It's a great question, Your Honor. The purpose of Rule 56 is to weed out these types of cases. Well, let me ask it this way. The affidavits come along, the declarations, from Mr. Dondero and Nancy. So what in the affidavits contradicts prior evidence, prior testimony, et cetera? I mean, because sham affidavit has to be something to basically manufacture a material issue of fact, right? Right. So how do they do that, or do they just add to the evidence? If you've got the time, Your Honor, I'm going to go through the list of reasons. Well, we've got 16 minutes. That's right. So I would say number one is everything I've already described. If you go to pages 18 to 21 of our brief, you'll see the citations to the record for everything I just described for you. But that's, to Judge Elrod's point, that's a jury argument. I'm grappling for what in the affidavits contradicts other evidence, his prior statements, in record. So the statements in the declarations that they say Nancy and Mr. Dondero had an oral agreement is contradicted by his statement that he entered the oral agreement on behalf of Hyland. It is contradicted by his answer to the interrogatory that Nancy and Duggeboy had no involvement and no actual knowledge of the alleged oral agreement. That's the contradiction. Well, he didn't say that. He just didn't list them or her as having knowledge about the issues in the case. It's a sworn interrogatory. No, but it's an omission. Is that enough to create a conflict to strike the affidavit? I believe it does, but in addition to all of that, because I want to give you the complete list, okay, it's contradicted by his proof of claim. His proof of claim is in the record at 9669. His proof of claim was filed in April 2020, long before he and Hyland got into an adversarial position, long before we had an asset monetization plan, long before we made a demand on the notes. And if you look at that proof of claim, again, there's absolutely nothing in the proof of claim. He had an opportunity there to describe the alleged oral agreement, and he doesn't do it. He just says, I issued the notes in lieu of compensation. No mention of Nancy, no mention of Dougaboy, no mention of an oral agreement, no mention of condition subsequent. The same thing, and this might be the most compelling evidence, frankly. He sat there at the confirmation hearing in early February 2020. We have made the demand on the notes. He has defaulted. He has defaulted on the term notes, and we have sued him. A principal component of the plan of reorganization was to collect on the notes in order to pay creditors. Mr. Dondero filed substantial objections to the disclosure statement, substantial objections to the plan of reorganization. The subject of the notes was the subject of testimony at the hearing. It was the subject of argument at the hearing. Everything's on the table, and he still doesn't raise any of these defenses, not only oral agreement but prepayment. He's got the opportunity at that moment to say, don't confirm this plan. I've got all these defenses. The creditors aren't going to get the money that's being projected in the financial statement. I mean, that's — I believe that that's compelling evidence, but there's plenty more. He says that he didn't disclose the agreements to Price Waterhouse Coopers because he didn't think they were material to Highland. Again, I urge the court to look at, in the record, at 70705 and 29462. Those are the management representation letters that he signed in 2018 and 2019. In the second paragraph, it specifically states that only certain of the representations are subject to materiality. And if you look at representation number 36, it requires him to disclose all related party transactions. It's not even subject to materiality. So it's another way that the declaration conflicts with undisputed evidence. Well, it's the same question that Judge Wilson asked. I — it's not light was red, light was green. It's light was red, I'm not saying anything about the color of the light. And I should be saying the light was red on the other party and not doing an aha moment at the trial. I'm sorry for the simplistic analogy, but — So just a few points on that. First of all, let's remember that we don't have the burden of rebutting their defense. They have the burden of creating a genuine dispute of material fact. And you create a genuine dispute of material fact when you put forth sufficient evidence that would allow a reasonable jury to render a verdict in favor of the party who has the burden of proof on that issue. And so all of these things show that they don't meet their burden of proof and they can never meet their burden of proof. But with respect specifically to the management representation letters, that's not just an omission. That is a misrepresentation. He misrepresented to their auditors that there was no interparty — interrelated party transaction when there was. That's an affirmative misrepresentation. But to get there — So, yes. So, I mean, that may in itself be something he's liable for civilly or criminally or whatever if you misrepresent to auditors. I'm not assuming that happened. Right. But why is that not — why isn't that an aha for your side at the trial of why he's — I wouldn't — — full of bull on his — for lack of a — that's not a very judicious thing to say. Why his thing is not true. I apologize. And I have no offense meant to your client in any way. So what I would do, Your Honor, is refer the court to the Supreme Court case of Scott v. Harris. In Scott v. Harris, you had — This isn't a video. It is exactly like a video. That's exactly the point. It is not like a video. We can look at the video ourselves. That's what we do in Scott v. Harris. It's the only place where we can look at the evidence and totally ignore the district court. It's exactly — it's exactly what the failure to disclose the management and the management representation is a video at that moment in time. The failure to speak up at the confirmation hearing when he had every incentive to do so is a video of that moment. But to get to where you're going, don't we have to weigh the factual record one against the other, and isn't that improper at summary judgment? That's the point, right? I would say I respectfully disagree. I mean, to exclude an affidavit as a sham affidavit, I'm just — I mean, I'm just a simple guy who had a practice in Mississippi, but I litigated this issue a couple few times. But it had to contradict the deposition testimony. Example, simple example. I slipped on the floor. I didn't see anything on the floor in the grocery store. And are you sure you didn't see anything? No, I didn't. Was there anything, any kind of signage? No, I didn't see anything like that. And then they come in with an affidavit at summary judgment and says there was something slippery on the floor, it was on my hand, I remember now, and also I think it had been there a while. That's a sham affidavit. It's excluded. It can't create a material fact issue. But if there isn't a statement previous that says there weren't any agreements or whatever it may be here, but then they come in with an affidavit and say, oh, yes, there were, and there were all these conditions subsequent, et cetera, I mean, if you don't have anything beforehand, how does this not just amplify or clarify what the summary judgment record is? So, great point, right? But courts do it all the time. And you don't even have to get so far as concluding that it's a sham affidavit. But courts shouldn't do it all the time. For example. Those are errors by courts, aren't they? No. So, for example, in U.S. versus. . . We reverse them all the time for doing it. That's the thing. Not at all. For U.S. versus Lawrence, for example, this court dealt with an enforcement on promissory notes. And the person was trying to resist the enforcement of the promissory notes with an affidavit that said he had a third party who was identified who had already paid the notes off. And the court said, didn't say it's a sham affidavit. I don't even think you have to go that far, although I do think it is a sham affidavit. But the court said, no, we're not accepting your affidavit because there's no evidence to support it. The same is true here. There is no evidence to support any of these defenses. And if I may. . . It's not a genuine dispute. That is exactly the point. Where is your case law best cases that support that this is not a genuine dispute? Selotex talks about the very principles of Rule 56. Okay? Selotex is another Supreme Court case law. Yeah. We know that one. That's right. And Ombly and Iqbal. Those are seminal cases. But where is the case where we're practically dealing with a dispute where there's evidence on both sides and we say, no, it's not a genuine dispute? I would, again, go to U.S. v. Lawrence. I would go to Alton v. Texas A&M. You know, Hacienda, Walmart. They're all cited in our brief. There's a legion of cases. This court doesn't hesitate. And here's the analysis. And this is what they're trying to do here. They're almost trying to make this a motion to dismiss standard. They're almost trying to say to the court, you have to accept the allegations as true. But that's not what we're doing on a motion for summary judgment. What you're doing on a motion for summary judgment is you're looking at the declaration. You're trying to give it the best possible light. But you must, in accordance with the very plain terms of Rule 56, look at it not in a silo, not in isolation, but relative to the entire record in the case. And that's the import of citing to things like his responses to the request for admission, his responses to the interrogatories. Because you don't look at these things in isolation. If you did, naturally you would conclude that there's a genuine dispute of material fact. But that is not the law. The law says that you must look at it in context and make a decision as to whether or not in context, in light of the entirety of the record, is a reasonable jury ever going to credit this? And I just want to touch on a couple of the other defenses. The mutual mistake defense. I mean, if the court would look in the record at 70154 through 7 and 70160, they will see contemporaneous emails that are sent to Frank Waterhouse, the person whose signatures are on the notes, the treasurer of HCMFA, and they say, Frank, we're going to transfer the money. We're going to book it as loans. We're going to issue the promissory notes. I mean, there's no genuine dispute of material fact that Mr. Waterhouse knew exactly what was happening and he's an officer of the company. Shared service. Oh, the insurance claim. Right? I mean, on the mutual mistake issue, they made an insurance claim in their name. They didn't mention that Highland was at fault. They didn't mention that Highland had paid them all this money. They took $5 million from the insurance company and now they say the $7.5 million from Highland, which Mr. Waterhouse was told was going to be in the form of a note, is somehow also compensation. They got $12.5 million for a $7.5 million loss. Does that even, to use the bankruptcy court's words, pass the straight face test? It does not. He had actual and apparent authority to sign the notes. The shared services agreement fails as a matter of law. Just look at the terms of the agreement. There's nothing in that agreement that authorizes, let alone commands, Highland to make payments on NextPoint's behalf without authority or authorization. And you don't have to take my word for it. Again, this is yet another contradiction in Mr. Dondero's declaration. Look at Frank Waterhouse's testimony. It's in the record at 2091-92. It's like two pages. And Mr. Waterhouse, at that point, still the treasurer of NextPoint, so his testimony binds NextPoint, no longer affiliated with Highland in any way, testifies unambiguously that Highland had no authority to make payments on behalf of NextPoint without approval from him or Mr. Dondero. That's what summary judgment is all about. You had an officer of the appellant testify exactly what the agreement says, and that is you can't do this unless you're authorized. Do you know anything about this? I think it's from the other side. Have you reviewed it? Is it appropriate for us to consider? Is this? I'll leave that to you. Okay. I haven't reviewed it. It was just given to you. It didn't get a copy before this morning? I got a copy this morning. Okay. I don't want to take any more time with it. Thank you, Your Honor. It just is sitting up here, and I didn't know what to do with it. And finally, on the shared services defense, there's also other testimony from Mr. Waterhouse that can be found in the record at 72428, where he testified. Actually, it's Ms. Hendrick's testimony, and it's unrebutted, that she was instructed by Mr. Waterhouse, again, the treasurer of NextPoint, not to make the payment. HCMS and HCRE, Mr. Dandera says they also had oral agreements to receive shared services. There's nothing in the record that they ever paid for them. There's nothing in the record to support that assertion. With respect to the prepayment defense, I would encourage the Court to look at the amortization schedules, because they provide definitive proof that the term note borrowers were in default. Those amortization schedules can be found in the record at 28602 and 74603. And what they'll show, and this is consistent with the term notes, right? In Section 2 of the term notes, the borrowers were required to pay each year one-thirtieth of the original principal amount, because it was a 30-year note, plus all accrued and unpaid interest as of December 31st. And it is true that Section 3 permitted them to make prepayments. It is true that notwithstanding the oral agreement defense, Mr. Dandera caused the term note lenders to repay millions and millions of dollars. The money's just sloshing one way and the other, right? We don't dispute that at all. But what you will find on those amortization schedules is that in December of each year, 2017, 18, and 19, notwithstanding the fact that these millions of dollars of prepayments were made, amounts were still due at year end. And pursuant to Section 2, those payments were required to be made. And they knew it. How did they know it? Because they were given a 13-week forecast in December 2020 that said there's interest payments owed at the end of the year. And they just didn't do it. That 13-week forecast can be found in the record at 28587. And then, to top it all off, they attempted to cure, which is not a criminal case, but it's kind of consciousness of guilt. They realized, oh, my gosh, we now step in it. And the attempt to cure contradicts the prepayment defense. It contradicts the oral agreement defense. It contradicts the shared services, you know, Highland was negligent defense. You wouldn't do that if you thought you had those defenses. Again, all of those payments are being made on the eve of confirmation. Mr. D'Andaro's lawyer stands up in court at confirmation and doesn't say any of this. You know why? Because it was all fabricated. It just was all fabricated. And that's the bottom line. And that's the purpose of summary judgment. I just want to close very briefly by referring the Court, really, to the Silatex case. Because Justice Rehnquist articulated very importantly what the purpose of summary judgment is. And if this case is not worthy of summary judgment, I don't know what is. If you can just throw anything out there to defeat summary judgment, no matter how outlandish, no matter how contradicted by undisputed evidence, we'll be doing this forever. Thank you, Your Honors. Thank you very much. Thank you. What's notable about my learned friend's argument is that it sounds a lot like a closing argument for a jury. And so I'm going to point out some of the ways in which what he says is contradictory evidence is not. So, for example, the attempt to cure, that's not a contradiction. That's because at the time, the conditions subsequent had not yet been met, and it was the practice to continue to pay as long as Highland needed money. And there was an allegation of default, and so there was a knee-jerk reaction, we have to pay. Now, in fact, what they could have said at the time is, gee, we did prepay. We shouldn't pay this money. And if you look at those schedules that Mr. Morris directed you to, you will see that the payments were made all across the year, and they weren't necessarily made on that due date at the end. And so the evidence is that those did satisfy the annual payments. And the fact that payments were made doesn't mean there wasn't a subsequent agreement to forgive the loan. It's because of Highland needed money. Payments were made, and the conditions for forgiveness had not yet come about. So it's not a contradiction. Another thing that was raised was the proof of claim, which was— Does the humble jury believe all of this? Yes, Your Honor, because remember, this is a closely held company where founder-owners make huge amounts of money. Many would take all the money out. Our expert said many would take all the money out at the end of the year, not leave anything in. And so, yes, this makes sense in this kind of business to have a plan that worked this way. So, yes. Did it make sense for him to stand mute at the confirmation hearing? He didn't. He had already filed a proof of claim saying that those loans might be forgiven as compensation. And at the time of the plan, the conditions for forgiveness had not yet been met. Cornerstone, MGM, and Trustway had not yet been— Why wouldn't that have been listed as a contingent liability or something? Why wouldn't that have been—because it's supposedly very sophisticated and lots of money. Why wouldn't those all have been—in any normal bankruptcy, they would have been listed as some kind of contingency? That's certainly— Even if not yet fulfilled. That's certainly something that would be argued to the jury. Gee, you shouldn't believe this because they should have said something at the time. But he did say something at the time. There are the proof of claims, and those are before confirmation. And then very early on in the dispute, there was a letter from former bankruptcy judge Lynn, who was representing Mr. Dondero, to Highland's counsels raising the loans as compensation issue. And there's testimony that Mr. Dondero told Mr. Waterhouse that don't take account of the notes necessarily in the plan because those might be forgiven. Some of these omissions are misrepresentations. I mean, you can't just stand mute and let an untruth be perpetrated on a court or in sworn testimony or representations like your discovery responses. Didn't list Nancy as having any knowledge whatsoever. Well, that's utterly not true if you take her declaration. I mean, how do you square that? At some level, it does go back to the idea of whether this dispute is genuine or manufactured. And I would ask the Court to remember or at least envision how chaotic the early days of the Highland bankruptcy were. So was there perfect information shared? Well, I don't know how chaotic, but we're talking about tens of millions of dollars in loans that were forgiven by an agreement orally. It wasn't even oral because it was me to me. And I knew the terms, and I knew what they were and all that. I knew the conditions subsequently. But I didn't tell anybody, even when it was time to file proofs of claim and assets of the estate and all those kinds of things, that if you omit something from your schedule of assets on a bankruptcy schedule, I mean, that's actionable, is it not? If it had come to pass. But, in fact, later the conditions occurred so the loans were forgiven. At the time, that had not yet occurred. And there was — But you can't just hide it until, well, now it's live. That's not the way those contingent guidelines work. I mean, would it have been more prudent to say something? Surely. But that's a factor that the jury is going to consider in deciding whether or not to accept this. It's not something that can be decided on summary judgment because it's one of many factors. And we submit the proof of claim and the letter actually support the notion. I see that my time is up unless you have any other questions. No, thank you very much. We appreciate the arguments of both sides, and this case is submitted. Thank you. Thank you.